DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
YOLANDA OCHOA (Cal. Bar No. 267993)
Email: ochoay@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>TOON GOGGLES, INC., and IRA WARKOL,<br><br>　　　　Defendants. | Case No. 2:19-cv-07687<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a) and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). Because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Ira Warkol resides in this district and Defendant Toon Goggles, Inc.'s ("Toon Goggles") principal place of business is located in this district.

## SUMMARY

4. This matter involves the unregistered offer and sale of over $19 million in securities by Toon Goggles, a privately held company that offers access to cartoons through its online streaming service, and by the company's recidivist founder, Ira Warkol. The registration violations occurred from approximately August 2012 through late 2016, when Toon Goggles and Warkol (collectively, "defendants") conducted at least five private offerings through various entities, raising funds from approximately 400 investors. None of the securities Warkol offered and sold to investors on behalf of Toon Goggles during this time period were registered with the SEC and none qualified for any of the exemptions from the registration requirements.

5. In addition, Warkol acted as an unregistered broker for these unregistered offerings, setting up boiler rooms inside Toon Goggles' offices, purchasing lead sheets, and engaging sales agents who were paid commissions to solicit investors. The sales agents then cold-called investors throughout the United States, including California, New York, Arizona, Texas, Missouri, and Washington, and solicited investments using scripts and offering documents Warkol provided. Warkol used the funds that he raised from investors to pay large commissions and transaction-based compensation to himself and the sales agents. In fact, it was not

uncommon for as much as 35% of investor funds to be used towards the payment of commissions and finder's fees.  Warkol did this without registering as a broker with the SEC and without qualifying for any of the exceptions to the registration requirements.

6. As a result of Toon Goggles' failure to properly register these offerings, investors were deprived of information under Section 7(a) of the Securities Act, which requires a registration statement to contain certain information spe, including the net proceeds derived from the securities sold during the two years preceding the offerings, the prices at which those securities were offered to the public, the amount of money paid to promotors during that time period, and the profit and loss statements of the issuer.

7. From August 2012 through at least late 2016, Toon Goggles was not a profitable company and its revenue never exceeded $200,000 a year.

8. Warkol and Toon Goggles failed to maintain accurate and complete records regarding the identity of each investor, the number of shares sold to each investor, and the amount of money raised from each investor.  Toon Goggles still does not know the total number of investors in Toon Goggles or the total amount of capital raised from investors.

9. By engaging in this conduct, defendants violated, and may be continuing to violate, the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77f.  Defendant Warkol also has violated, and may be continuing to violate, the broker-dealer registration requirements of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

10. With this action, the SEC seeks permanent injunctive relief against defendants to prevent future violations of the federal securities laws, disgorgement of ill-gotten gains from defendants, along with prejudgment interest, and civil penalties from defendants.

**THE DEFENDANTS**

11. **Ira Warkol (a.k.a. Ira Warren)** founded Toon Goggles in 2010 and controlled the company until he terminated his relationship with Toon Goggles in 2017. Warkol is not, and has never been, registered with the SEC in any capacity. On June 30, 2011, the California Department of Corporations issued a Desist and Refrain Order against Warkol (who was then using the name "Ira Warren"), prohibiting him from engaging in the offer or sale in California of securities of Toon Goggles' predecessor that were not qualified, and from the offer and sale of securities through materially false or misleading communications (the "2011 D&R Order"). On November 19, 2018, the California Department of Business Oversight issued another Desist and Refrain Order against Warkol, prohibiting him from the further offer and sale in California of non-exempt securities related to a cannabinoids business he founded after terminating his relationship with Toon Goggles.

12. **Toon Goggles, Inc.** is a Nevada corporation with its principal place of business in Los Angeles, California. The company markets itself as an on-demand entertainment service for children that offers animated cartoons, live-action shows, games, and music via the web and mobile applications.

**OTHER RELEVANT ENTITIES**

13. **NetKids LLC ("NetKids")** was a Nevada limited liability company established in August 2011. According to offering materials distributed by defendants, its primary purpose was to handle the raising of capital for Toon Goggles and Dinomite Apps, Inc. before being dissolved in July 2016.

14. **Dinomite Apps, Inc. ("Dinomite")** was a Nevada corporation established in 2013 to function as the videogame arm for Toon Goggles. Dinomite dissolved in 2015.

15. **Yeti Productions LLC ("Yeti Productions")** was established in 2014 to develop a cartoon series for Toon Goggles.

# THE ALLEGATIONS

## A. Toon Goggles' Streaming Business

16. Warkol founded Toon Goggles in late 2010 as a media service provider that offered licensing and online streaming of cartoons, games, news, and other children's entertainment services. Toon Goggles offered these services through its website ToonGoggles.com and through mobile applications.

17. According to Warkol, Toon Goggles was founded based on the observation that only a small percentage of professionally-produced cartoon series end up on television, meaning most are not seen by children anywhere. Toon Goggles sought to take advantage of that gap and marketed itself as the "YouTube or Netflix for kids," where tens of millions of children every month could watch thousands of cartoons, most of them never seen before.

18. In its promotional materials, Toon Goggles claimed to have (i) the ability to track visitors to its website, Toongoggles.com, (ii) the technology to permit cartoon rights holders to upload their cartoons effortlessly onto its platform, and (iii) developed mobile applications to allow its streaming services to be taken with anyone anywhere and to be accessed on almost any mobile device.

## B. Toon Goggles' Unregistered Securities Offerings

19. From mid-2012 through at least 2016, Warkol raised over $19 million from at least 400 investors in multiple states on behalf of Toon Goggles without a registration statement being filed or in effect and when no exemption from registration applied.

20. Warkol engaged in a general solicitation of investors and failed to take reasonable steps to verify that the individuals who purchased securities were accredited investors.

21. Warkol purchased lead sheets and hired unregistered sales agents, who set up boiler rooms inside Toon Goggles' offices and cold-called investors throughout the United States, soliciting investors in California, New York, Arizona,

Texas, Missouri, and Washington.

22. Warkol provided sales agents with sales pitches to use when soliciting investors and approved commissions and other forms of transaction based compensation for the sales agents, which they based on a percentage of the funds raised from investors.

23. Warkol never disclosed the 2011 D&R Order to investors.

24. Warkol failed to maintain accurate and complete records regarding the offerings, including an inability to identify: each investor, the number of shares sold to each investor, and the amount of money raised from each investor.

25. Warkol relied on various forms of self-accreditation to determine if investors were accredited, including having investors fill out questionnaires about their financial background, and failed to take reasonable steps to verify that information.

### 1. The October 2011 NetKids Offering

26. Beginning in or about October 2011 and continuing until approximately April 28, 2016, Warkol offered investors units in NetKids ("the October 2011 NetKids offering").

27. The offering materials for the October 2011 NetKids offering included a Private Placement Memorandum ("PPM").

28. The offering materials stated that the offering was exempt from SEC registration requirements and that it was for "accredited purchasers only," which the offering documents described as generally including, among others, "any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of purchase, exceeds $1,000,000."

29. Warkol sought to raise a total of $4,800,000 through the October 2011 NetKids offering, by offering investors a total of 80 units in NetKids at a cost of $60,000 per unit.

30. According to the offering materials, NetKids was "directly related" to

ToonGoggles.com and the purpose of the October 2011 NetKids offering was to "continue behind the scenes development [of ToonGoggles.com], to acquire more cartoon content from producers all over the world, to implement advertising and market ToonGoggles.com all over the world, and to design a specific add campaign to attract those currently on other children's and parents' websites."

31. The offering materials stated that, if all 80 units were sold and $4,800,000 was raised, NetKids would acquire a 10% equity stake in Toon Goggles.

32. Investors who participated in the October 2011 NetKids offerings were issued Toon Goggles stock certificates in exchange for their investment.

33. Defendants did not register the October 2011 NetKids offering with the SEC.

34. The offering materials contained an "Offeree Questionnaire." The questionnaire requested information about investors' investment experience, net worth, and expected annual income. It also requested that investors sign the questionnaires representing that the information provided in the questionnaire was to the best of their knowledge complete, true, correct, and could be relied upon.

**2.    The September 2013 Dinomite Offering**

35. Beginning in or about September 2013 and continuing until approximately August 24, 2015, Warkol offered investors stock in Dinomite Apps, Inc. ("Dinomite") ("the September 2013 Dinomite offering").

36. The offering materials for the September 2013 Dinomite offering included an agreement between the prospective investor, Dinomite, and, for purposes of certain provisions, Warkol.

37. Warkol described Dinomite in offering materials as a company formed for the purpose of creating and/or publishing mobile games, some of which would be based on cartoon series appearing on the Toon Goggles platform.

38. According to the offering materials, Dinomite stock was being offered to

raise approximately $1.5 million in "seed capital" for Toon Goggles, which would be used to begin the development of mobile games appearing on Toon Goggles.

39. Warkol offered shares of Dinomite stock at $0.50 per share and gave investors a one-time option to exchange their Dinomite stock for shares of Toon Goggles that Warkol owned as a founder and principal of Toon Goggles. One of the conditions to the exchange options was that investors had to do the exchange within nine months of purchasing Dinomite stock.

40. Toon Googles purports to have, as of approximately February 26, 2019, issued shares of Toon Goggles in exchange for all known outstanding shares of Dinomite stock.

41. Defendants did not register the September 2013 Dinomite offering with the SEC.

42. The offering materials contained a provision that required investors to represent and warrant as a part of the investment agreement they signed that they were "accredited investors" under Rule 501 of Regulation D of the Securities Act.

### 3. The October 2013 NetKids Offering

43. Beginning in or about October 2013 and continuing until approximately April 28, 2016, Warkol offered investors additional units in NetKids ("the October 2013 NetKids offering").

44. The offering materials for the October 2013 NetKids offering included a PPM.

45. The offering documents stated that the offering was exempt from SEC registration requirements and that it was for "accredited purchasers only," which the offering documents described as generally including, among others, "any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of purchase, exceeds $1,000,000."

46. Warkol sought to raise a total of $4,500,000 with the October 2013 NetKids offering by offering investors a total of 75 units in NetKids, convertible to

1 | shares of Toon Goggles, at a cost of $60,000 per unit.

2 | 47.  According to the offering documents, NetKids' ability to raise this working capital was "relevant" to the continued operations of ToonGoggles.com and the purpose of the October 2013 NetKids offering was to "continue behind the scenes development [of ToonGoggles.com], to secure more cartoon content from producers all over the world, to implement advertising and marketing plans for ToonGoggles.com on a global basis, and to design a specific ad campaign to attract kids currently on other children's and parents' websites."

48.  The offering documents stated that each of the 75 units was designated as convertible to 30,000 shares of Toon Goggles stock at $2.00 per share and that the proceeds were deemed to be an adequate level of working capital sufficient to sustain the continued operations of ToonGoggles.com.

49.  Investors who participated in the October 2013 NetKids offerings were issued Toon Goggles stock certificates in exchange for their investment.

50.  Defendants did not register the October 2013 NetKids offering with the SEC.

51.  The offering materials contained an "Offeree Questionnaire."  The questionnaires requested information about investors' investment experience, net worth, and expected annual income.  It also requested that investors sign the questionnaires representing that the information provided in the questionnaire was to the best of their knowledge complete, true, correct, and could be relied upon.

**4.      The November 2013 NetKids Offering**

52.  Beginning in or about November 2013 and continuing until approximately April 28, 2016, Warkol offered investors more units in NetKids ("the November 2013 NetKids offering").

53.  The offering materials for the November 2013 NetKids offering included a PPM.

54.  The offering materials stated that the offering was exempt from SEC

registration requirements and that it was for "accredited purchasers only," which the offering documents described as generally including, among others, "any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of purchase, exceeds $1,000,000."

55. Warkol sought to raise a total of $3,000,000 with the November 2013 NetKids offering, by offering investors a total of 50 units in NetKids, convertible to stock in Dinomite, at a cost of $60,000 per unit.

56. According to the offering documents, an additional principal function of NetKids was also to handle the raising of capital for Dinomite, and the purpose of the November 2013 NetKids offering was to support Dinomite's "development of video games, some based on cartoons resident on certain Internet sites, to create marketing plans, and to design an intensive global advertising and promotion campaign to attract kids now on other children's and gaming sites."

57. The offering documents stated that Dinomite had entered into an "exclusive arrangement" with Toon Goggles to allow Dinomite to access its array of cartoon content and to advertise on Toon Goggles for free in exchange for giving Toon Goggles 15% of the revenue Dinomite generated from the video games it was developing.

58. The November 2013 NetKids offering documents stated that each of the 50 units being offered was designated as convertible to 120,000 shares of Dinomite stock (6,000,000 shares total) at $0.50 per share and that the proceeds were deemed to be an adequate level of working capital sufficient to sustain the continued operations of Dinomite.

59. Investors who participated in the November 2013 NetKids offerings were issued Toon Goggles stock certificates in exchange for their investment.

60. Defendants did not register the November 2013 NetKids offering with the SEC.

61. The offering materials contained an "Offeree Questionnaire." The

questionnaire requested information about investors' investment experience, net worth, and expected annual income. It also requested that investors to sign the questionnaire representing that the information provided in the questionnaire was to the best of their knowledge complete, true, correct, and could be relied upon.

### 5. The Yeti Offering

62. Beginning in or about mid-2015 and continuing until approximately November 16, 2016, Warkol offered investors membership interests in Yeti Productions, LLC ("Yeti") ("the Yeti offering").

63. The offering materials for the Yeti offering included an agreement between the prospective investor and Toon Goggles.

64. The Yeti offering documents that were provided to investors state that Yeti was formed to create, distribute, license and/or publish a cartoon series, merchandise and videogames based on an existing concept co-produced with another content provider entitled "Eddie is a Yeti."

65. According to the offering documents, Mondo TV had entered into an agreement with Toon Goggles for the development of the "Eddie is a Yeti" project and the parties to the investment agreement would be the investor and Toon Goggles.

66. The offering of Yeti membership interests was to raise approximately $1.5 million in "seed capital" in order to continue the creation, distribution, licensing, publishing, and merchandising of "Eddie is a Yeti."

67. Defendants did not register the Yeti offering with the SEC.

68. The offering documents contained a provision that required investors to represent and warrant as a part of their investment agreement that they had "sufficient liquid assets" to invest in Yeti's investment program.

### C. Defendants' Securities Registration Violations

69. All of the units, stock, and membership interests that Warkol offered and sold to investors in NetKids, Dinomite, and Yeti respectively, were securities.

70. Each investor invested money in a common enterprise, namely the

continued operations of Toon Goggles, NetKids, Dinomite, and Yeti, with the expectation that any profits or revenues derived from those operations would come solely through the efforts of defendants and others.

71. All of the units, stock, and membership interests that Warkol offered investors in NetKids, Dinomite, and Yeti respectively, were integrated and part of a single plan of financing.

72. Each of the offerings was for the same general purpose in that they were to continue the operations of Toon Goggles through the raising of capital for the creation, distribution, licensing, and merchandising of media content to be used on its website and mobile applications.

73. Each of the offerings was for the same type of consideration in that investors received their units, stock, and membership interests in exchange for money.

74. Each of the offerings occurred at or around the same time in that they took place between August 2012 and late 2016, if not consecutive to one another.

75. Toon Goggles was the issuer for each of the offerings.

76. Although Warkol used NetKids, Dinomite, and Yeti to conduct the offerings, Warkol, acting on behalf of Toon Goggles, controlled all of the offerings and had the authority, which he regularly exercised, to convert and exchange the units, stock, and membership interests of NetKids, Dinomite and Yeti into shares of Toon Goggles.

77. Toon Goggles, NetKids, Dinomite, and Yeti were all engaged in the same type of business and their business operations overlapped.

78. For example, Toon Goggles entered into an agreement to develop Eddie is a Yeti and Dinomite agreed to give Toon Goggles 15% of its revenue in exchange for free advertising.

79. Many of the employees of Toon Goggles also worked on the Dinomite and Yeti projects.

80. NetKids, Dinomite and Yeti shared Toon Goggle's office space.

81. Toon Goggles, Netkids, Dinomite, and Yeti had over 25 bank accounts combined and investor funds from each of the five offerings were regularly commingled and transferred between these accounts.

82. Defendants each directly and indirectly participated in the unregistered offer and sale of Toon Goggles' securities to investors.

83. Toon Goggles, as the issuer of the securities, directly offered and sold its securities in the unregistered offering.

84. Warkol offered and sold Toon Goggles' securities when he engaged sales agents to solicit investors, purchased lead sheets for the sales agents, paid and directed others to pay commissions and finder fees to sales agents, gave himself "transaction-based" compensation, and reviewed offering materials that were distributed to investors, all of which made Warkol a necessary participant and substantial factor in Toon Goggles' offering.

85. None of the offerings qualified for an exemption from the securities registration requirements.

86. Neither Warkol nor Toon Goggles maintained complete and accurate records of the number of securities sold to investors, amount of funds raised from investors, subscription agreements signed by investors, and the stock certificates issued to investors. The defendants also failed to maintain complete records of the stock that investors converted or exchanged. As a result, defendants do not know the current number of investors in Toon Goggles or the total amount of capital raised from investors.

87. Although some of the offering documents claimed that the offerings were for "accredited purchasers only" and others purportedly required investors to "represent and warrant" that they were "accredited investors" and had "sufficient liquid assets" to invest, Warkol failed to take reasonable steps to verify that the investors they sold securities to in connection with the offerings were accredited and

at least 8 investors were unaccredited.

88. Warkol never required investors to provide any Internal Revenue Service forms reporting the investor's income, bank statements, brokerage statements, certificates of deposit, tax assessments, or an appraisal report issued by an independent third party to verify their accredited status.

89. Warkol never disclosed to investors a reasonable time prior to sale of the securities that on June 30, 2011, the California Department of Corporations issued a Desist and Refrain Order against Warkol (who was then using the name "Ira Warren"), prohibiting him from the offer or sale in California of securities that were not qualified and from the offer and sale of securities through materially false or misleading communications.

90. Because Warkol controlled Toon Goggles and was acting within the scope of his authority and on behalf of Toon Goggles when he conducted the offerings, his conduct can be imputed to Toon Goggles.

**D.   Defendant Warkol Acted as an Unregistered Broker**

91. Between in or about August 2012 through early 2017, Warkol acted as an unregistered broker for Toon Goggles' five integrated offerings identified above.

92. Warkol raised over $19 million from at least 400 investors in connection with these offerings and personally received at least approximately $1,748,985.42 in transaction-based compensation.

93. Warkol directly and indirectly participated in these offerings and in the business of offering, selling, or otherwise effecting transactions in securities for the accounts of others.

94. Warkol purchased lead sheets for the five offerings identified above and hired sales agents to solicit investors and to answer questions investors had about the offerings.

95. Warkol oversaw a general solicitation of investors located throughout the United States, including California, New York, Arizona, Texas, Missouri, and

Washington.

96. Warkol setup a boiler room inside Toon Goggles' offices and received transaction-based compensation for himself and paid the sales agents a large commission when securities were sold to investors. It was not uncommon for as much as 35% of investor funds from the five offerings to be used towards the payment of commissions and finder's fees.

97. Warkol reviewed the offering documents that the sales agents used to solicit investors and various marking materials.

98. Warkol typically signed and issued the stock certificates that investors received when they purchased securities.

99. Warkol was the signatory on at least ten of the bank accounts that received investor funds and directed how investor money should be spent.

100. Warkol never registered as a broker-dealer with the SEC in accordance with Section 15(b) of the Exchange Act and was never associated with a registered broker-dealer during any of the five offerings identified above.

## TOLLING OF THE STATUTE OF LIMITATIONS

101. Pursuant to a tolling agreement between Toon Goggles and the SEC, the statute of limitations applicable to the SEC's claims against Toon Goggles was tolled and suspended for the period beginning on August 10, 2017 through February 12, 2020.

102. Pursuant to a tolling agreement between Warkol and the SEC, the statute of limitations applicable to the SEC's claims against Warkol was tolled and suspended for the period beginning on August 10, 2017 through August 10, 2019.

## FIRST CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against all Defendants)

103. The SEC realleges and incorporates by reference paragraphs 1 through

102 above.

104. None of the five offerings defendants conducted through NetKids, Dinomite, and Yeti were registered with the SEC, and no exemption from the registration requirements applied to them.

105. By engaging in the conduct described above, Defendants Warkol and Toon Goggles, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

106. By engaging in the conduct described above, Defendant Warkol and Toon Goggles have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c).

### SECOND CLAIM FOR RELIEF
### Unregistered Broker-Dealer
### Violation of Section 15(a) of the Exchange Act
### (against Defendant Warkol)

107. The SEC realleges and incorporates by reference paragraphs 1 through 102 above.

108. Defendant Warkol acted as an unregistered broker by, among other things, purchasing lead sheets, hiring sales representatives to solicit investors, paying sale agents' commissions and receiving transaction-based compensation for selling securities, reviewing offering documents sent out to investors, and generating stock certificates issued to investors.

109. By engaging in the conduct described above, Defendant Warkol made

use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

110. By engaging in the conduct described above, Defendant Warkol has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Warkol and Toon Goggles, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Warkol, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

### IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 5, 2019

*/s/ Douglas M. Miller*
Douglas M. Miller
Yolanda Ochoa
Attorneys for Plaintiff
Securities and Exchange Commission